RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 22a0259p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

RICCY MABEL ENRIQUEZ-PERDOMO,

                *Plaintiff-Appellant*,

    *v.*

RICARDO A. NEWMAN, et al.,

                *Defendants-Appellees*.

> No. 20-6393

─────────────────

Appeal from the United States District Court for the Western District of Kentucky at Louisville.
No. 3:18-cv-00549—Charles R. Simpson, III, District Judge.

Argued:  July 22, 2021

Decided and Filed:  December 5, 2022

Before:  BATCHELDER, WHITE, and DONALD, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:**  Benjamin T. D. Pugh, PUGH & ROACH ATTORNEYS AT LAW, PLLC, Covington, Kentucky, for Appellant.  Timothy D. Thompson, UNITED STATES ATTORNEY'S OFFICE, Louisville, Kentucky, for Appellees.  **ON BRIEF:**  Benjamin T. D. Pugh, Christopher D. Roach, PUGH & ROACH ATTORNEYS AT LAW, PLLC, Covington, Kentucky, Michael J. O'Hara, O'HARA, TAYLOR, SLOAN & CASSIDY, Crestview Hills, Kentucky, for Appellant.  Timothy D. Thompson, UNITED STATES ATTORNEY'S OFFICE, Louisville, Kentucky, for Appellees.

     WHITE, J., delivered the opinion of the court in which DONALD, J., joined. BATCHELDER, J. (pp. 19–21), delivered a separate dissenting opinion.

———————————

**OPINION**

———————————

HELENE N. WHITE, Circuit Judge.    Plaintiff-Appellant Riccy Enriquez-Perdomo appeals the district court's dismissal of her claims against Defendants-Appellees United States Immigration and Customs Enforcement (ICE) officers Ricardo Newman, Joseph Phelps, John Korkin, and Shawn Byers (collectively, "Defendants"), brought under the First, Fourth, and Fifth Amendments to the United States Constitution.  The district court dismissed Enriquez-Perdomo's complaint for lack of subject-matter jurisdiction under 8 U.S.C. § 1252(g).  We AFFIRM the dismissal of Enriquez-Perdomo's First Amendment retaliation claim, VACATE the judgment with respect to her other claims, and REMAND for further proceedings consistent with this opinion.

**I.**

**A.  Factual Background**

Enriquez-Perdomo is a Honduran national and resident of Florence, Kentucky.  In August 2004, when Enriquez-Perdomo was nine years old, an immigration judge in Harlingen, Texas, ordered that she be removed to Honduras after she failed to appear at her removal hearing.  The next month, on September 16, 2004, an Immigration and Naturalization Service (INS) official signed a warrant of removal/deportation.  The INS directed Enriquez-Perdomo to report to Harlingen in October 2004, but never removed her.

In 2012, the Department of Homeland Security (DHS) instituted an immigration-relief program called Deferred Action for Childhood Arrivals (DACA).  Under DACA, certain young immigrants may apply for a renewable two-year deferral of removal.  DACA applies only to persons who immigrated to the United States when they were under the age of sixteen; were under the age of thirty-one in 2012; have continuously resided in the United States since 2007; are currently in school, have completed high school, have obtained a general-education-development certificate, or are honorably discharged veterans; have not been convicted of a felony, a significant misdemeanor, or multiple misdemeanors; and pose no threat to national

security or public safety. DHS "exercis[es] its prosecutorial discretion" to defer removal under DACA "on an individual basis." R. 29-1, PID 152–53. The Secretary of Homeland Security's memorandum announcing DACA (the "DACA Memorandum") explained that "[a]s part of this exercise of prosecutorial discretion, the above criteria are to be considered whether or not an individual is already in removal proceedings or subject to a final order of removal." *Id.*

In March 2013, United States Citizenship and Immigration Services (USCIS) approved Enriquez-Perdomo for DACA. She renewed her DACA status in March 2015 and January 2017. As of the events giving rise to this lawsuit, Enriquez-Perdomo had DACA status that was active through January 30, 2019. DHS never terminated her DACA status.

On August 17, 2017, Enriquez-Perdomo went to an ICE office in Louisville, Kentucky, to post bond for ICE detainees. Enriquez-Perdomo's complaint alleges that during her visit, Defendants checked the government's database and confirmed that she had received DACA, but nevertheless arrested and detained her. According to the complaint, Defendants did not obtain a warrant for her arrest or inform her of the reason for her arrest. She claims that her arrest was motivated in part by her ethnicity and in part by her assistance of ICE detainees.[1]

Enriquez-Perdomo alleges that prior to her arrest, she had visited the ICE office frequently, was on a first-name basis with many of the ICE agents and staff, and had provided free interpretation services to ICE agents; that during her visits to that office, ICE agents, including Newman, had confirmed her immigration status; and that when Phelps, Korkin, and Byers arrested her, Newman informed them that there was no lawful basis to do so. Enriquez-Perdomo further alleges that Defendants transported her between several different facilities in three states and deprived her of sleep and food during her eight days in custody.

**B. Procedural History**

Enriquez-Perdomo sued Defendants in their individual capacities, asserting five claims for money damages under *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971): (1) unconstitutional arrest and imprisonment under the Fourth Amendment,

---

[1]These claims are not relevant to our analysis.

(2) unconstitutional pretrial detention under the Fourth Amendment, (3) First Amendment retaliation, (4) violation of due process under the Fifth Amendment, and (5) violation of equal protection under the Fifth Amendment.

Defendants filed a "motion to dismiss/motion for summary judgment" under Rules 12(b)(1), 12(b)(6), and 56 of the Federal Rules of Civil Procedure, arguing that 8 U.S.C. § 1252(g) deprived the court of jurisdiction to consider Enriquez-Perdomo's claims. They also asserted that Enriquez-Perdomo failed to state a claim because no *Bivens* remedy is available for the claims she asserts, and that Defendants are entitled to qualified immunity.[2]

Defendants submitted evidence to "challeng[e] the factual existence" of subject-matter jurisdiction. R. 20-1, PID 61. Newman submitted a declaration, asserting that on August 17, 2017, his office conducted searches in USCIS's "Computer-Linked Application Information Management System" (CLAIMS) and "Person Centric Query Service" (PCQS) databases, which revealed that Enriquez-Perdomo was "subject to an active removal order and warrant of removal and, further, did not have any current legal status." R. 20-4, PID 86. He also stated that he reviewed the CLAIMS, PCQS, and "ENFORCE Alien Removal Module" (EARM) databases, which "confirmed that [Enriquez-Perdomo] was subject to an existing removal order from 2004 and that her [DACA] expired in March 2017." *Id.* at PID 86–87. Newman asserted that he could not confirm that Enriquez-Perdomo had DACA status in his search of the databases. *Id.* at PID 87. He also claimed that he notified Enriquez-Perdomo that "she was being charged under 8 U.S.C. § 1182." *Id.* Newman further declared that after Enriquez-Perdomo was detained and transferred to Chicago for removal, "it was discovered that USCIS had begun inputting DACA information into the Electronic Immigration System (ELIS) [database,] and CLAIMS and PCQS no longer had the most up-to-date information." *Id.*

Korkin submitted declarations confirming that the CLAIMS, PCQS, Enterprise Document Management System, and Central Index System databases all failed to reveal that Enriquez-Perdomo had active DACA status. He asserted that he was not aware that USCIS had

---

[2]The district court did not address these additional issues, finding no jurisdiction.

begun entering DACA information into ELIS, nor that the databases he searched had not been updated.

Enriquez-Perdomo opposed Defendants' motion, submitting a declaration that conflicted with Newman's. Enriquez-Perdomo then filed a motion for a stay pending discovery under Rule 56(d) of the Federal Rules of Civil Procedure. The district court granted the stay, limiting discovery to the issue of subject-matter jurisdiction, and specifically to "(1) document discovery to obtain the electronic and other documents that Defendants relied upon in deciding to detain and transport [Enriquez-Perdomo] on August 17, 2017; (2) evidence regarding what information Defendants relied upon in deciding to detain and transport [Enriquez-Perdomo;] . . . and (3) information regarding the authenticity of the warrant of removal/deportation." R. 37, PID 474.

After jurisdictional discovery, Enriquez-Perdomo filed a supplemental opposition to Defendants' motion, attaching an expert declaration from Mark Lanterman, Chief Technology Officer of Computer Forensic Services. Lanterman stated that "Newman conducted a person and activity search of CIS, CLAIMS3, CLAIMS4, ELIS[,] and ELIS 2" on August 17, 2017, and Enriquez-Perdomo's DACA status was listed in the ELIS 2 database as of January 5, 2017. R. 60-2, PID 553–54.

In response, Defendants submitted a declaration from Jeffrey A. Wilson, the Unit Chief of the Information Technology Management for Enforcement and Removal Operations at ICE. According to Wilson, Newman conducted a search for Enriquez-Perdomo in the EARM database, which displayed "Yes" in the "Proceed With Removal" field. Wilson stated that the "Proceed With Removal" field was updated to "No" on August 30, 2017. Newman submitted another declaration clarifying the information that he reviewed. He asserted that he reviewed the EARM database, which listed Enriquez-Perdomo's "case category" as "8C," meaning "subject to a final order of removal"; listed her "processing disposition" as "Bag and Baggage," meaning that she had been ordered removed by an immigration judge; showed a "Current/Active Alert" indicating that she was "subject to a final order of removal and, if located, [she] should be detained and removed"; and displayed "Yes" in the "Proceed With Removal" field. R. 61-3, PID 583–84. Newman also declared that he did "not recall requesting [PCQS] to search [the ELIS or

ELIS 2 databases] for information about . . . Enriquez-Perdomo"; "[a]t the time that Ms. Enriquez-Perdomo was detained, [he] was unfamiliar with ELIS and ELIS 2"; and he "believed [that] CLAIMS and CLAIMS 2 contained the most up-to-date DACA information." *Id.* at PID 584.

## C. District Court's Decision

The district court dismissed Enriquez-Perdomo's claims, concluding that it was deprived of jurisdiction by 8 U.S.C. § 1252(g), which states, in relevant part, that "no court shall have jurisdiction to hear any cause or claim by . . . any alien arising from the decision or action by the Attorney General to . . . execute removal orders against any alien under this chapter." The district court reasoned:

> It is undisputed that Enriquez-Perdomo's profile showed that she was subject to a final order of removal because her "Case Category" was an "8C," her "Processing [Disposition]" was labeled "Bag and Baggage," there was a "Current/Active Alert[]" that showed "F.O[.] of Removal," and the word "Yes" was listed beside the words "Proceed With Removal." It is also undisputed that the populated table under EARM's tab labeled "Actions/Decisions" provided a description that Enriquez-Perdomo was "Ordered Excluded / Deported / Removed." It should be noted that later, the word "No" was listed beside the phrase "Proceed With Removal," but this did not appear in the EARM database until after Enriquez-Perdomo was arrested.

> Based on this information, Newman ordered that Enriquez-Perdomo be detained. He then recorded on Form I-213 that "[a]n extensive search of DHS databases revealed ENRIQUEZ [sic] to be subject of [] a final order [Bag and Baggage]," Enriquez-Perdomo "had DACA which expired on 03/19/2017," and that she was "removable in accordance with . . . 8 [U.S.C. §] 1182."

> Enriquez-Perdomo disputes neither (1) that she was subject to a valid removal order nor (2) that Newman's review of her file in EARM revealed that she was subject to a valid removal order. But she contends that her claims do not arise from a decision or action to execute a removal order because her DACA status prevented the Defendants from executing an order of removal against her. We disagree with her circular reasoning. The 2004 order of removal still existed after Enriquez-Perdomo initially obtained DACA status in 2013, no court had filed an order that stayed her removal, and the Defendants mistakenly executed the valid removal order after reviewing Enriquez-Perdomo's profile in the EARM database that provided numerous indications that she was actively subject to removal. In fact, one of the exhibits offered by Enriquez-Perdomo confirms that her "Case Category" was an "8C." Although the execution of the removal order should not

have been carried out, Enriquez-Perdomo's claims are directly connected to the Defendants' decision to execute a valid removal order against her. Thus, Enriquez-Perdomo fails to demonstrate that her claims do not stem from the enforcement of a valid removal order.

R. 62, PID 602–03 (citations omitted).

## II.

### A.  Facial Versus Factual Attack

A defendant can challenge subject-matter jurisdiction in one of two ways: a facial attack or a factual attack. *Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 440 (6th Cir. 2012). "A facial attack on the subject-matter jurisdiction alleged in the complaint questions merely the sufficiency of the pleading." *Gentek Bldg. Prods., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007). When considering a facial attack, we "tak[e] the allegations in the complaint as true," and "[i]f those allegations establish federal claims, jurisdiction exists." *Id.* We review de novo a district court's resolution of facial challenges to subject-matter jurisdiction. *Wayside Church v. Van Buren County*, 847 F.3d 812, 817 (6th Cir. 2017), *abrogated on other grounds by Knick v. Township of Scott*, 139 S. Ct. 2162, 2167–68 (2019). "A factual attack, by contrast, is advanced when the movant contests the alleged jurisdictional facts by introducing evidence outside the pleadings." *Gaetano v. United States*, 994 F.3d 501, 505 (6th Cir. 2021). "In such a case, the district court has wide discretion to allow affidavits, documents, and even a limited evidentiary hearing to resolve jurisdictional facts, and the court can actually weigh evidence to confirm the existence of the factual predicates for subject-matter jurisdiction." *Id.* (citations and internal quotation marks omitted). When considering a factual attack, we review for clear error the district court's factual findings and review de novo the district court's application of law to facts. *See id.* at 505–06. The district court concluded that Defendants' challenge to subject-matter jurisdiction was a factual attack.

Defendants agree that their motion was a factual attack on subject-matter jurisdiction. They argue that "[t]hey filed with their motion to dismiss declarations and Enriquez-Perdomo's final order of removal and warrant of deportation/removal establishing that the district court lacked subject matter jurisdiction"; that "Enriquez-Perdomo responded to Defendants' motion to

dismiss and presented her own evidence"; and that "the district court weighed all of the evidence put before it and made factual findings in its memorandum opinion dismissing Enriquez-Perdomo's [c]omplaint." Appellees' Br. at 12–13.

Enriquez-Perdomo argues that the motion was a facial attack. She asserts that "Defendants have not challenged the existence of the primary factual prerequisite, i.e., that Plaintiff, in fact, had approved DACA status at the time of her arrest"; that there is "no factual dispute regarding the fact that there was no active order of removal at the time of her arrest in that [she] had approved DACA status"; and that "the district court rendered no specific findings of fact regarding material facts that were disputed by the parties, i.e., whether any facts support Defendants' contention that they had no knowledge of Plaintiff's active DACA status." Appellant's Br. at 18–19.

On the one hand, Defendants sought to demonstrate facts showing that 8 U.S.C. § 1252(g) applies—namely, that Enriquez-Perdomo "was detained because of her order of removal." R. 61, PID 559. The district court granted limited jurisdictional discovery of, among other things, "the electronic and other documents that Defendants relied upon in deciding to detain and transport [Enriquez-Perdomo] on August 17, 2017." R. 37, PID 474. And, the district court found that "Newman ordered that Enriquez-Perdomo be detained" at least in part "[b]ased on th[e] information" regarding her removal order in the government databases. R. 62, PID 602. On the other hand, the district court could have resolved the jurisdictional issue by considering only the undisputed fact—alleged in the complaint and conceded by Defendants—that Enriquez-Perdomo had DACA status when Defendants arrested and detained her. *See infra* Section II.B.

We need not characterize Defendants' challenge as a facial or factual attack for purposes of this appeal because, in any event, we review de novo the district court's resolution of the central legal issue underlying subject-matter jurisdiction in this case: whether 8 U.S.C. § 1252(g) bars Enriquez-Perdomo's suit even though her DACA status rendered her removal order unenforceable.

**B. Subject-Matter Jurisdiction**

8 U.S.C. § 1252(g) provides:

(g) Exclusive jurisdiction

Except as provided in this section and notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General[3] to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.

Congress initially passed the provision as part of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. 104-208, 110 Stat. 3009, and amended the provision as part of the REAL ID Act of 2005, Pub. L. 109-13, 119 Stat. 231.[4]

**1.**

To assess § 1252(g)'s scope, we first consider the statute's text. *See Nebraska v. Parker*, 577 U.S. 481, 488 (2016). For purposes of this case, we focus on the meaning of the statute's phrase "execute removal orders." Because the statute does not define the term, we "give the term its ordinary meaning." *United States v. Riccardi*, 989 F.3d 476, 486 (6th Cir. 2021) (quoting *United States v. Zabawa*, 719 F.3d 555, 559 (6th Cir. 2013)); *see also Bostock v. Clayton County*, 140 S. Ct. 1731, 1738 (2020) ("This Court normally interprets a statute in accord with the ordinary public meaning of its terms at the time of its enactment."). "To discern that ordinary meaning, [a statute's] words must be read and interpreted in their context, not in isolation." *Southwest Airlines Co. v. Saxon*, 142 S. Ct. 1783, 1788 (2022).

Considering the term "removal orders" in § 1252(g) in context alongside the preceding word "execute," we read "removal orders" as referring to *executable* removal orders—that is,

---

[3]The statute's reference to the "Attorney General" is now synonymous with the "Secretary of DHS." *Elgharib v. Napolitano*, 600 F.3d 597, 607 (6th Cir. 2010). The Homeland Security Act of 2002 "transferred the Attorney General's immigration enforcement responsibilities to the Secretary of DHS." *Arce v. United States*, 899 F.3d 796, 799 n.4 (9th Cir. 2018) (citing 6 U.S.C. § 202(3); *Clark v. Martinez*, 543 U.S. 371, 374 n.1 (2005)).

[4]The REAL ID Act amended § 1252(g) by adding "(statutory or nonstatutory), including section 2241 of title 28, United States Code, or any other habeas corpus provision, and sections 1361 and 1651 of such title" after "notwithstanding any other provision of law." REAL ID Act of 2005, Pub. L. 109-13, § 106(a), 119 Stat. 231, 311.

existing and enforceable removal orders subject to execution. But Enriquez-Perdomo's removal order was not subject to execution because she had DACA status when Defendants arrested and detained her.

As the Supreme Court has explained, "DACA is not simply a non-enforcement policy"—that is, "the DACA Memorandum did not merely refus[e] to institute proceedings against a particular entity or even a particular class." *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1906 (2020) (internal quotation marks omitted). Rather, the DACA Memorandum "directed USCIS to establish a clear and efficient process for identifying individuals who met the enumerated criteria," and established an adjudicative process for "conferring affirmative immigration relief." *Id.* (internal quotation marks omitted).

Notwithstanding her removal order, Enriquez-Perdomo was eligible to be considered for DACA relief. When she became a DACA recipient, she was granted "affirmative . . . relief" from removal. *See Regents*, 140 S. Ct. at 1906. Although the government was free to terminate that relief, it did not, and Enriquez-Perdomo's arrest and detention despite that relief were unauthorized. Accordingly, § 1252(g) does not preclude Enriquez-Perdomo's claims because her removal order was not executable.[5]

**2.**

"[I]f the text [of a statute] is unclear, we may look at '[t]he broader context' of the statute and statutory purpose together to resolve the ambiguity." *United States ex rel. Felten v. William Beaumont Hosp.*, 993 F.3d 428, 431 (6th Cir. 2021) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 345–46 (1997)); *see also* John F. Manning, *What Divides Textualists from Purposivists?*, 106 Colum. L. Rev. 70, 84 (2006) ("Because speakers use language purposively, textualists recognize that the relevant context for a statutory text includes the mischiefs the authors were addressing. Thus, when a statute is ambiguous, textualists think it quite appropriate to resolve that ambiguity in light of the statute's apparent overall purpose."). Accounting for the possibility that the phrase "execute removal orders" in § 1252(g) is ambiguous, we also assess § 1252(g)'s

---

[5]In concluding that Enriquez-Perdomo's removal order was not "executable," we do not draw any conclusions about other circumstances in which removal orders may not be "executable." Rather, our analysis is limited to the circumstances of this case.

applicability in light of Congress' purpose in enacting it. The statutory purpose supports jurisdiction.

In *Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471 (1999) [hereinafter *AADC*], the Supreme Court interpreted § 1252(g) "narrow[ly]," holding that the jurisdictional bar applies "only to three discrete actions that the Attorney General may take: her 'decision or action' to '*commence* proceedings, *adjudicate* cases, or *execute* removal orders.'" *Id.* at 482 (quoting 8 U.S.C. § 1252(g)). The Court noted that the provision does not preclude "all claims arising from deportation proceedings," including challenges to "decisions to open an investigation, to surveil the suspected violator, to reschedule the deportation hearing, to include various provisions in the final order that is the product of the adjudication, and to refuse reconsideration of that order." *Id.* The Court also addressed Congress' motivation in enacting the provision:

> There was good reason for Congress to focus special attention upon, and make special provision for, judicial review of [the three discrete actions enumerated in § 1252(g)]—which represent the initiation or prosecution of various stages in the deportation process. At each stage the Executive has discretion to abandon the endeavor, and at the time IIRIRA was enacted the INS had been engaging in a regular practice (which had come to be known as "deferred action") of exercising that discretion for humanitarian reasons or simply for its own convenience. . . . Since no generous act goes unpunished, however, the INS's exercise of this discretion opened the door to litigation in instances where the INS chose *not* to exercise it. . . .
>
> Section 1252(g) seems clearly designed to give some measure of protection to "no deferred action" decisions and similar discretionary determinations, providing that if they are reviewable at all, they at least will not be made the bases for separate rounds of judicial intervention outside the streamlined process that Congress has designed.

*Id.* at 483–85; *see also id.* at 485 n.9 (explaining that § 1252(g) "was directed against a particular evil: attempts to impose judicial constraints upon prosecutorial discretion"); *id.* at 486 (describing the "theme" of IIRIRA as "protecting the Executive's discretion from the courts"); *id.* at 487 (referring to the provision as a "discretion-protecting provision . . . specifically directed at the deconstruction, fragmentation, and hence prolongation of removal proceedings").

Congress' purpose, as articulated in *AADC*, supports our interpretation that "execute removal orders" contemplates removal orders that are subject to execution. By definition, when a removal order is not subject to execution, government officials have no authority, discretionary or otherwise, to execute it. As noted previously, when Enriquez-Perdomo became a DACA recipient, she was granted "affirmative . . . relief" from removal. *See Regents*, 140 S. Ct. at 1906. Consequently, her removal order was not subject to execution, and Defendants did not have authority to arrest or detain her. And, because our textual interpretation does not allow for judicial review of governmental decisions that Congress intended to shield from review, our reading of § 1252(g) comports with Congress' purpose in enacting it.

We note that, in considering the provision's purpose, we find it unnecessary to take a position on the circuit split regarding whether § 1252(g) applies only to discretionary decisions and actions. Rather, we rely on *AADC*'s discussion of Congress' purpose to assess whether our reading is consistent with that purpose. We conclude that it is.[6]

---

[6]Although not argued by the parties, a "familiar principle of statutory construction"—the "presumption favoring judicial review of administrative action"—also supports jurisdiction. *See Guerrero-Lasprilla v. Barr*, 140 S. Ct. 1062, 1069 (2020) (quoting *Kucana v. Holder*, 558 U.S. 233, 251 (2010)). "Under that 'well-settled' and 'strong presumption,' when a statutory provision 'is reasonably susceptible to divergent interpretation, we adopt the reading that accords with traditional understandings and basic principles: that executive determinations generally are subject to judicial review.'" *Id.* (quoting *McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 498 (1991); *Kucana*, 558 U.S. at 251). The presumption "'may be overcome by specific language' in a provision or evidence 'drawn from the statutory scheme as a whole.'" *Patel v. Garland*, 142 S. Ct. 1614, 1627 (2022) (quoting *Block v. Community Nutrition Inst.*, 467 U.S. 340, 349 (1984)).

The Supreme Court has "consistently applied" the presumption to immigration statutes. *Guerrero-Lasprilla*, 140 S. Ct. at 1069 (citing *Kucana*, 558 U.S. at 251). For example, in *Guerrero-Lasprilla*, the Supreme Court interpreted the "limited-review provision" of the Immigration and Nationality Act (INA)—8 U.S.C. § 1252(a)(2)(D)—which provides that, in immigration cases involving non-citizens who are removable for having committed certain crimes, a court of appeals may consider only "constitutional claims or questions of law." *See* 140 S. Ct. at 1068–73. The Court held that "questions of law" "include[] the application of a legal standard to undisputed or established facts." *Id.* at 1068. The Court relied in part on the presumption of judicial review of administrative action. *Id.* at 1068–70; *see also Kucana*, 558 U.S. at 251–52 (relying on the presumption to interpret 8 U.S.C. § 1252(a)(2)(B)(ii), and noting that the Court has "consistently applied that interpretive guide to legislation regarding immigration, and particularly to questions concerning the preservation of federal-court jurisdiction").

In *Patel*, the Supreme Court interpreted 8 U.S.C. § 1252(a)(2)(B)(i), which states, in relevant part, that "no court shall have jurisdiction to review . . . any judgment regarding the granting of relief under section . . . 1255 of this title." The Court held that the provision "precludes judicial review of factual findings that underlie a denial of relief." 142 S. Ct. at 1618. The Court reasoned in part that the provision applies to "*any* judgment," and "encompasses not just 'the granting of relief' but also any judgment *relating to* the granting of relief," which "plainly includes factual findings." *Id.* at 1622. The Court also rejected the government's argument that the word "judgment" refers only to "discretionary" decisions, reasoning in part that "[h]ad Congress intended instead to limit

**3.**

We recognize that two decisions of our sister circuits found no jurisdiction in similar circumstances. In *Silva v. United States*, 866 F.3d 938 (8th Cir. 2017), an immigration judge ordered the plaintiff removed to Mexico, and the plaintiff appealed to the Board of Immigration Appeals. *Id.* at 939. Although the appeal automatically stayed the plaintiff's removal under federal regulations, the government removed the plaintiff to Mexico. *Id.* The government returned the plaintiff to the United States when it realized its mistake. *Id.* The plaintiff brought suit in federal court, asserting claims under the Federal Tort Claims Act (FTCA) and the Constitution. *Id.* The Eighth Circuit, holding that § 1252(g) deprived it of jurisdiction, rejected the plaintiff's argument that the provision applies only to discretionary decisions, reasoning that the provision "makes no distinction between discretionary and nondiscretionary decisions." *Id.* at 940. "So long as the claim arises from the decision to execute a removal order," the court concluded, "there is no jurisdiction." *Id.* The court relied in part on the Fifth Circuit's decision in *Foster v. Townsley*, 243 F.3d 210 (5th Cir. 2001), which held that § 1252(g) deprived the court of jurisdiction to consider the plaintiff's challenge to her removal in violation of an automatic stay. *Id.* at 214.

In contrast, the Ninth Circuit found jurisdiction in *Arce v. United States*, 899 F.3d 796 (9th Cir. 2018). There, United States Customs and Border Protection officers detained the plaintiff, a Mexican citizen, in California. 899 F.3d at 798. An immigration judge ordered him removed, but he filed a motion for a stay of removal, which the Ninth Circuit granted. *Id.* at 799. Despite the stay, the government removed the plaintiff to Mexico, where he remained until the Ninth Circuit ordered his return. *Id.* He sued the government, alleging violations of the FTCA. *Id.* The Ninth Circuit held that the federal courts had jurisdiction to consider the plaintiff's

---

the jurisdictional bar to 'discretionary judgments,' it could easily have used that language—as it did elsewhere in the immigration code." *Id.* at 1624 (citing 8 U.S.C. §§ 1226(e), 1252(b)(4)(D)). The Court added that the presumption favoring judicial review of administrative action did not apply because the "text and context" of the provision "clearly indicates" that the provision precludes judicial review of factual findings underlying a denial of relief under 8 U.S.C. § 1255. *Id.* at 1627.

Although § 1252(g) refers to "any cause or claim," the language following that phrase cabins its application, as discussed in *AADC*. *See* 525 U.S. at 482. Thus, unlike the provision in *Patel*, § 1252(g) does not "clearly indicate" that the federal courts cannot consider Enriquez-Perdomo's claims. *See* 142 S. Ct. at 1627. And, Defendants have not offered "evidence drawn from the statutory scheme as a whole" suggesting that we have no jurisdiction. *See id.* (internal quotation marks omitted).

claims. *Id.* at 798. The court reasoned that the plaintiff was "not attacking the removal order itself, as he [did] not challenge the validity of his removal order, or claim that the Attorney General should have exercised discretion to delay his removal." *Id.* at 800. Rather, because "the Attorney General lacked the authority to execute the removal order," the plaintiff's claims arose "from the violation of [the court-ordered stay]."[7] *Id.*

Neither *Silva* nor *Foster* explicitly engaged with the meaning of the term "execute removal orders." And, our interpretation of § 1252(g)'s text does not depend on the premise— rejected in *Silva* and *Foster*—that the provision precludes only claims arising from discretionary decisions and actions. Rather, our interpretation of the text is limited to the conclusion that the statute contemplates "executable" removal orders, and a removal order rendered unenforceable by a grant of DACA that has not been rescinded or terminated is not subject to execution.

In sum, because § 1252(g)'s text establishes that the provision does not bar Enriquez-Perdomo's claims, the district court erred in dismissing the case for lack of subject-matter jurisdiction.

## C. *Bivens* Claims

Defendants argue that "[t]he absence of a *Bivens* remedy in this context is an alternative basis for affirming the district court's dismissal of this action." Appellees' Br. at 33. Although the Supreme Court has held that there is no *Bivens* remedy for First Amendment retaliation claims, we decline to address whether a *Bivens* remedy is available for Enriquez-Perdomo's Fourth Amendment and Fifth Amendment claims as part of this appeal.

---

[7]The court added:

> [E]ven if we agreed with the government that [the plaintiff's] claims tangentially "arise from" the execution of his removal order, we would still retain jurisdiction because the Attorney General entirely lacked the authority, and therefore the discretion, to remove him. "Follow[ing] the [Supreme] Court's instruction to interpret § 1252(g) narrowly," *United States v. Hovsepian*, 359 F.3d 1144, 1155 (9th Cir. 2004) (en banc), we have limited the statute's jurisdiction-stripping power to actions challenging the Attorney General's discretionary decisions to initiate proceedings, adjudicate cases, and execute removal orders.

*Arce*, 899 F.3d at 800.

42 U.S.C. § 1983 enables a person to seek money damages for constitutional violations by State officials. *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1854 (2017). However, no analogous federal statute authorizes similar suits against federal officials. *Id.* In *Bivens*, the Supreme Court recognized for the first time "an implied private action for damages against federal officers alleged to have violated a citizen's constitutional rights." *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 66 (2001). Specifically, *Bivens* recognized a damages remedy for alleged violations of the Fourth Amendment by federal officers. *See* 403 U.S. at 397. Bivens alleged that Federal Bureau of Narcotics agents entered his apartment, arrested him for narcotics violations, "manacled" him, and searched his apartment. *Id.* at 389. He sued the agents, asserting that they had no warrant for the arrest or search, used unreasonable force, and lacked probable cause for the arrest. *Id.*

"The purpose of *Bivens* is to deter individual federal officers from committing constitutional violations." *Malesko*, 534 U.S. at 70. But a money-damages remedy is not available for all constitutional violations by federal officers. The Supreme Court has noted that "expanding the *Bivens* remedy is now considered a 'disfavored' judicial activity," *Ziglar*, 137 S. Ct. at 1857 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)), and "in all but the most unusual circumstances, prescribing a cause of action is a job for Congress," *Egbert v. Boule*, 142 S. Ct. 1793, 1800 (2022). Since *Bivens*, the Supreme Court has only twice extended the availability of the *Bivens* remedy: first, to a sex-discrimination claim brought against a member of Congress under the Fifth Amendment, *see Davis v. Passman*, 442 U.S. 228, 245–49 (1979), and second, to a claim of deliberate indifference to a prisoner's medical needs brought against federal prison officials under the Eighth Amendment, *see Carlson v. Green*, 446 U.S. 14, 17–23 (1980).

The Supreme Court has established a two-step inquiry for determining whether a *Bivens* remedy is available in a particular context. *See Egbert*, 142 S. Ct. at 1803. First, a court asks "whether the case presents 'a new *Bivens* context'—*i.e.*, is it 'meaningful[ly]' different from the three cases in which the Court has implied a damages action." *Id.* (quoting *Ziglar*, 137 S. Ct. at 1859). Second, "if a claim arises in a new context, a *Bivens* remedy is unavailable if there are 'special factors' indicating that the Judiciary is at least arguably less equipped than Congress to

'weigh the costs and benefits of allowing a damages action to proceed.'" *Id.* (quoting *Ziglar*, 137 S. Ct. at 1858). The Court recently noted that "those steps often resolve to a single question: whether there is any reason to think that Congress might be better equipped to create a damages remedy." *Id.*; *see also id.* at 1805 ("The *Bivens* inquiry does not invite federal courts to independently assess the costs and benefits of implying a cause of action. A court faces only one question: whether there is *any* rational reason (even one) to think that *Congress* is better suited to 'weigh the costs and benefits of allowing a damages action to proceed.'" (quoting *Ziglar*, 137 S. Ct. at 1858)); *id.* at 1809 (framing the inquiry as "whether 'there are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy' at all") (quoting *Ziglar*, 137 S. Ct. at 1858)). Additionally, "a court may not fashion a *Bivens* remedy if Congress already has provided, or has authorized the Executive to provide, 'an alternative remedial structure.'" *Id.* at 1804 (quoting *Ziglar*, 137 S. Ct. at 1858).

In *Egbert*, the plaintiff, who owned an inn on the U.S.-Canada border and was a confidential informant for federal agents, notified a U.S. Border Patrol agent that a Turkish national had scheduled transportation to the inn. *Id.* at 1800–01. Later that day, the agent followed the plaintiff's vehicle to the inn. *Id.* at 1801. The plaintiff instructed the agent to leave his property, but the agent allegedly refused and threw the plaintiff to the ground. *Id.* The plaintiff filed a grievance with the agent's supervisors and an administrative claim with Border Patrol. *Id.* at 1801–02. He alleged that the agent retaliated against him by reporting the plaintiff's license plate—which read "SMUGLER"—to the Washington Department of Licensing, and by contacting the Internal Revenue Service, which prompted an audit of the plaintiff's tax returns. *Id.* at 1802. Border Patrol took no action against the agent and denied the plaintiff's administrative claim. *Id.* The plaintiff sued the agent in federal court, alleging excessive force under the Fourth Amendment and retaliation under the First Amendment. *Id.*

The Supreme Court held that *Bivens* did not extend to the plaintiff's claims. *Id.* at 1800. Rejecting the excessive-force claim, the Court reasoned that "[t]he special-factors inquiry . . . shows here . . . that the Judiciary is not undoubtedly better positioned than Congress to authorize a damages action in this national-security context." *Id.* at 1805. The Court explained, "That this case does not involve a cross-border shooting, as in [*Hernández v. Mesa*, 140 S. Ct. 735 (2020)],

but rather a more 'conventional' excessive-force claim, as in *Bivens*, does not bear on the relevant point. Either way, the Judiciary is comparatively ill suited to decide whether a damages remedy against any Border Patrol agent is appropriate." 142 S. Ct. at 1805. The Court added that aggrieved parties in the plaintiff's position had alternative remedies, including the ability to file a grievance with Border Patrol. *Id.* at 1806. The Court further held that "there is no *Bivens* action for First Amendment retaliation," reasoning that Congress is in a better position to decide whether to provide a damages action in part because "[f]ederal employees 'face[d with] the added risk of personal liability for decisions that they believe to be a correct response to improper [activity] would be deterred from' carrying out their duties." *Id.* at 1807 (quoting *Bush v. Lucas*, 462 U.S. 367, 389 (1983)).

Enriquez-Perdomo's First Amendment retaliation claim is not viable after *Egbert*. Because we can affirm the district court's decision on any ground supported by the record, *M.J. ex rel. S.J. v. Akron City Sch. Dist. Bd. of Educ.*, 1 F.4th 436, 451 (6th Cir. 2021), we affirm the district court's dismissal of Enriquez-Perdomo's First Amendment retaliation claim.

*Egbert*, however, does not appear to explicitly foreclose *Bivens*' potential extension to Enriquez-Perdomo's Fourth and Fifth Amendment claims, each of which allege different constitutional violations than those alleged in *Egbert*, and none of which are brought against Border Patrol agents.

"[Q]uestions regarding the proper scope of *Bivens* are complex, often involving thorough analyses of alternative remedy schemes created by Congress or factors counselling hesitation in the absence of such action." *Butts v. Martin*, 877 F.3d 571, 588 (5th Cir. 2017). Other appellate courts have declined to address the availability of a *Bivens* action where it was not addressed by a lower court because of the complexity of the question presented and the need for comprehensive briefing. *See, e.g.*, *Ziglar*, 137 S. Ct. at 1865 ("Given the absence of a comprehensive presentation by the parties, and the fact that the Court of Appeals did not conduct the analysis, the Court declines to perform the special factors analysis itself. The better course is to vacate the judgment below, allowing the Court of Appeals or the District Court to do so on remand."); *Butts*, 877 F.3d at 584 (declining to analyze the plaintiff's *Bivens* claim and

remanding "[g]iven the complexity of the issue and the dearth of arguments available to th[e] [c]ourt").

The same reasons for remand apply here. Although the parties briefed the *Bivens* issue in the district court, the district court limited discovery to the issue of subject-matter jurisdiction, and its ruling was limited to that issue; the district court did not address whether a *Bivens* remedy is available for Enriquez-Perdomo's claims. In her opening brief on appeal, Enriquez-Perdomo addresses the potential availability of a *Bivens* remedy only with respect to her First and Fourth Amendment claims. Her reply brief addresses only "the most critical points" of the *Bivens* issue. Reply Br. at 13. Neither party addressed the issue at oral argument. And, since briefing and argument, the Supreme Court has provided additional guidance for courts to consider when assessing potential extensions of *Bivens*. *See Egbert*, 142 S. Ct. at 1804–09. Without the benefit of analysis by the district court, comprehensive briefing from both parties, and oral argument, we decline to analyze at this time whether a *Bivens* remedy is available for each of Enriquez-Perdomo's remaining, distinct constitutional claims.

## III.

We emphasize that our only concern today is the jurisdictional question whether § 1252(g) deprives the federal courts of jurisdiction to adjudicate Enriquez-Perdomo's wrongful removal claims. We do not assess the merits of those claims or any defenses to those claims. Instead, we remand to the district court to consider the parties' arguments in the first instance.

For the foregoing reasons, we AFFIRM IN PART and VACATE IN PART the district court's judgment, and REMAND for further proceedings consistent with this opinion.

_____

**DISSENT**

_____

ALICE M. BATCHELDER, Circuit Judge, dissenting.

The text of 8 U.S.C. § 1252(g) precludes the court's jurisdiction over the Secretary's decision or action to "execute removal orders." Enriquez-Perdomo's claims arose from such a decision. Her claims are therefore barred by the statute. Because the majority sees it otherwise, I must respectfully dissent.

**I.**

In the ordinary course of immigration proceedings, an immigration judge determines whether an alien should be removed from the United States and, upon determining that the alien should be removed, issues a final order of removal. 8 U.S.C. §§ 1229, 1229a; 8 C.F.R. § 1241.1. DHS, through its ICE officers, then executes that removal order. Under the IIRIRA,

> no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by [the Secretary of DHS] to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.

8 U.S.C. § 1252(g). Simply put, the courts cannot review the Secretary's discretionary decisions to remove or not remove an alien the immigration court has ordered removed. *Id.*; *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 482 (1999).

Under DACA, the Secretary possesses the prosecutorial discretion to defer removing certain aliens who entered the United States illegally as children. Janet Napolitano, Department of Homeland Security Memorandum, Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children, June 15, 2012 ("Memo"); April 4, 2013 DACA National Standard Operating Procedures ("SOP"). The Secretary determined that, based on certain criteria, this prosecutorial discretion should be exercised regardless of whether or not "an individual is already in removal proceedings or subject to a final order of removal." Memo at 3. "Deferred action is a discretionary determination to defer removal action for an individual

as an act of prosecutorial discretion. Deferred action does not confer any lawful status." SOP at 8. DACA, therefore, does not change whether the alien has a removal order that can be enforced, but merely allows deferral of enforcement. Exercising prosecutorial discretion does not render a valid final order of removal unenforceable.

## II.

Enriquez-Perdomo sued four ICE officers in their individual capacities under *Bivens*, alleging violations of her First, Fourth, and Fifth Amendment rights. The district court dismissed her claims for lack of subject-matter jurisdiction for three reasons: (1) her removal order from 2004 was still a valid final order of removal, even though it was deferred pursuant to DACA, (2) there are no court orders staying her removal, and (3) the defendants mistakenly executed the valid (but deferred) final order of removal from 2004 because the databases they reviewed indicated that she was actively subject to removal. The main question here is whether the court has subject-matter jurisdiction over the claims stemming from defendants' decision to begin removing her when the databases allegedly did not show her deferred DACA status. The answer is no.

Enriquez-Perdomo's argument that her removal order is unenforceable because of her DACA status is incorrect. "An individual with an unexecuted final removal order is still in removal proceedings." SOP at 74. Because DACA did not change or otherwise abrogate the valid order of removal, DACA status does not affect the IIRIRA's scope. While DACA status may defer removal, DACA status does not mean the alien cannot be removed in the future. Nor does it mean that the alien's status cannot change during the deferred time period. For example, deferred status can be terminated if the alien was deferred in error, if the alien committed fraud in obtaining deferral under DACA, or if the alien commits disqualifying criminal offenses or becomes a public safety or national security concern. SOP at 132-33. Deferring removal does not mean a valid removal order does not exist or cannot be enforced.

In this case, defendants decided to execute a valid final order of removal against Enriquez-Perdomo, depriving this court of jurisdiction over her claim. Her claims are "'connected directly and immediately' to a decision to execute a removal order." *Silva v. United*

*States*, 866 F.3d 938, 940 (8th Cir. 2017).  The fact that she had DACA status does not matter because it does not affect the validity or enforceability of that order.  *Id.*  Nor does it matter whether the defendants made a mistake in determining whether Enriquez-Perdomo had DACA status.  A possible mistake in the exercise of discretion cannot be enough to give the court jurisdiction over her claims because it would destroy the purpose of the IIRIRA.  Moreover, no court had issued a stay or cancelled her removal order, so her claim is not rooted in some other possible violation.  Although mistakes may have been made, the defendants were acting pursuant to her valid final order of removal from 2004.  This court therefore has no jurisdiction over her claims because they arise directly from the Secretary's prosecutorial discretion to execute her valid final order of removal.  8 U.S.C. § 1252(g).

## III.

For the foregoing reasons, I would affirm the district court.  Therefore, I respectfully dissent.